No. 83-325

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

RODNEY EUGENE WATSON,

Defendant and Appellant.

APPEAL FROM: District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable James B. Wheelis, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

James Park Taylor & John E. Riddiough argued,
Public Defenders, Missoula, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Kimberly Kradolpher argued, Asst. Atty. General,
Helena, Montana
Robert L. Deschamps, III, County Attorney, Missoula,
Montana: Robert Sullivan argued, Deputy County Attorney,
Missoula, Montana

Submitted: March 15, 1984

Decided: August 3, 1984

Filed:

AUG 3 - 1984

_Ethel M. Harrison_
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Defendant was convicted by a jury of attempted deliberate homicide, aggravated assault and burglary. The court designated him a dangerous offender and a persistent felony offender. He was sentenced to 100 years imprisonment on each count without possibility of parole or furlough. Defendant raises two issues on appeal:

(1) Did the trial court err in instructing the jury on the law of mental disease and defect?

(2) Was it cruel and unusual punishment to sentence the defendant to 300 years imprisonment without possibility of parole or furlough after finding that the defendant suffers from a serious mental disorder?

We affirm the conviction and the sentencing order.

These facts are undisputed. Defendant began drinking beer and smoking marijuana during the afternoon of October 2, 1982. Later that evening, he entered a Missoula apartment, stole some pocket change and a hunting knife, and left when the occupant awakened. He then entered another apartment, took a purse, and left. He returned to the second apartment, entered a bedroom, and stabbed a sleeping women 35 times with the stolen knife. When a man entered the room, the defendant stabbed him in the leg and fled.

Andrew Floberg's leg had a four-inch puncture wound, which developed a large blood clot. Although 33 of Melissa Smith's 35 stab wounds were superficial, it took approximately four hours for an emergency room surgeon to suture them. The combination of substantial blood loss and a collapsed lung made her injuries life threatening, but she survived. Defendant was arrested wearing a jacket stained with Melissa Smith's blood.

2

After receiving Miranda warnings and signing an acknowledgement of advice of rights, the defendant gave a recorded statement to the police. His confession included unpublicized details of the crime and an admission that he entered Melissa Smith's apartment twice - first taking her purse, then returning with intent to have sexual intercourse with her. According to his statement, he stabbed Ms. Smith to subdue her resistance. Defendant's taped confession was admitted into evidence at trial. It contained no mention of any demon spirit.

Defendant was charged by information with attempted deliberate homicide, aggravated assault and burglary. He pleaded not guilty and noticed his intent to rely on mental disease or defect. Upon requests from prosecution and defense counsel, the court ordered five psychiatric/psychological examinations of the defendant prior to trial. Defendant was found fit to proceed.

Trial by jury began February 2, 1983. Both the State and the defense presented lay and expert witnesses, who testified regarding defendant's mental condition. Defense witnesses testified regarding the defendant's past involvement in Satanic worship and defendant's belief that the demon spirit Asmodeus was in possession of his body on the night he stabbed Melissa Smith and Andrew Floberg.

The judge instructed the jury on the elements of each of the crimes charged, burdens of proof, reasonable doubt and mental disease or defect. The jury was given special verdict forms, allowing them to find the defendant guilty, not guilty by reason of mental disease or defect, or not guilty. On February 10, 1983, the jury returned unanimous verdicts of guilty on each count.

Prior to the sentencing hearing, the court received recommendations in a pre-sentence investigation report and evaluations by one psychiatrist, four clinical psychologists and a medical doctor. The sentencing court found that the defendant suffers from a serious mental disorder, but that the defendant was able to appreciate the criminality of his conduct and able to conform his conduct to the requirements of the law.

Based upon the court's designation of defendant as a persistent felony offender, the defendant was sentenced to 100 years imprisonment for each of the three felony offenses, sentences to run consecutively. These sentences are within the statutory maximum terms. See section 46-18-502(2) & (4), MCA.

Based upon the court's designation of defendant as a dangerous offender and for the protection of society, the court specified that the defendant shall be ineligible for parole or participation in the supervised release program. This restriction on defendant's sentence is authorized by section 46-18-202(2), MCA.

In the sentencing order, the court transferred custody of the defendant to Montana State Prison and requested that the Warden transfer the defendant to Warm Springs State Hospital or any other facility deemed appropriate by the Warden. After a suicide attempt in May 1983, defendant was in fact transferred from Montana State Prison to Warm Springs State Hospital.

The record contains a letter from a psychiatrist and a psychologist at the Warm Springs State Hospital Forensic Unit indicating that the defendant petitioned for return to Montana State Prison from the Hospital on June 15, 1983. The

4

Forensic Unit doctors agreed to his request based upon the following factors:

> "1)   The patient stated he can 'make it' in the prison as long as he is given residence in the maximum security area.   Says things are on a smaller scale there and he can handle that.
>
> "2)   He claimed he would not put up with the larger group setting in the prison and would use suicide to escape that situation.   It is our opinion this choice is based on his preferential reasoning, and value judgment, and his view of the Bible.   It is not based on psychotic delusions or the commands of voices or hallucinations.   Thus, upon return to MSP, we recommend this individual remain in the maximum security area for a long time.
>
> "3)   In short, this individual's problem behaviors and his threat to harm himself is not based on mental illness, and does not require hospitalization at this time."

Defendant remains at Warm Springs State Hospital pending this appeal.

I

The insanity defense to criminal responsibility evolved from the concept that punishing those who are blameless for their actions is morally unacceptable and does nothing to serve the basic objectives of criminal law, i.e. rehabilitation and deterrence.   "Our collective conscience does not allow punishment where it cannot impose blame." Holloway v. United States (D.C.Cir. 1945), 148 F.2d 665, 666-67.

The English Crown first employed the insanity defense as a tool of pardon in the 13th Century.   Pardons were replaced by the concept of the "King's Grace," which was granted to mitigate punishment, not guilt.   By the 16th Century, a legal rationale developed that absolved certain offenders from criminal responsibility  based on a lack of moral capacity. "The insane were perceived as infants or 'beasts' in their moral and cognitive abilities.   Deprived of understanding and memory, such a man could not know what he was doing, nor

5

could be the object of punishment." N. Fink & N. Larene, In Defense of the Insanity Defense, 62 Mich. B.J. 199 (March 1983). The test for criminal responsibility was whether the accused "does not know what he is doing, no more than . . . a wild beast." Rex v. Arnold (1724), 16 How.St.Tr. 695, 764.

> "Later, English courts began to focus on whether the accused could distinguish between right and wrong. They also began to hear medical testimony. The landmark M'Naghten case made both these trends a standard part of English and American law." Washington v. United States (D.C.Cir. 1967), 390 F.2d 444, 445.

Daniel M'Naghten held the delusionary belief that there was a widespread Tory plot aimed at his ultimate destruction. In "self-defense," M'Naghten attempted to assassinate the Tory leader, British Prime Minister Sir Robert Peel, but shot and mistakenly killed the Minister's secretary, who happened to be riding in the Minister's carriage at the time. During a lengthy trial, it was established that M'Naghten's actions were based upon delusionary, irrational beliefs and that he suffered from what today might be termed paranoia schizophrenia. The jury returned a verdict of not guilty by reason of insanity.

Under M'Naghten, the test for insanity was whether the accused was laboring under such a defective reason from a disease of the mind, as not to know the nature and quality of what he was doing or, if he did know it, that he did not know he was doing what was wrong. Daniel M'Naghten's Case (1843), 10 C.&F. 200, 8 Eng.Rep. 718. The M'Naghten Rule relieves a person from criminal responsibility if he was "laboring under such a defective reason."

Throughout much of the 20th Century, the M'Naghten Rule continued to be the dominant test for establishing an insanity defense. A combination of the M'Naghten rule and the irresistible impulse rule was followed in Montana until

1967, when a modified version of the Model Penal Code was enacted. See State v. Noble (1963), 142 Mont. 284, 384 P.2d 504; State v. Peel (1899), 23 Mont. 358, 59 P. 169.

Sixteen states continue to use the M'Naghten standard of insanity. I. Keilitz & J. Fulton, The Insanity Defense and Its Alternatives at 22 (National Center for State Courts 1983). Several jurisdictions excuse criminal responsibility for conduct that resulted from an "irresistible impulse" or a person's inability to control his actions. Colorado, Georgia, New Mexico and Virginia use combinations of the M'Naghten and irresistible impulse standards.

The American Law Institute insanity standard is used in twenty-five state jurisdictions and most of the federal courts. I. Keilitz & J. Fulton, The Insanity Defense and Its Alternatives at 22 (National Center for State Courts 1983). The ALI test provides that a "person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of law." American Law Institute, Model Penal Code, Proposed Official Draft §4.01, at 74 (1962). Today this formula is the predominate standard among the state courts, although most of the states that use it have modified it to some extent. See I. Keilitz & J. Fulton, The Insanity Defense and Its Alternatives at 22, note b (National Center for State Courts 1983).

II

In 1967 Montana adopted a modified version of the ALI standard:

> "(a) A person is not responsible for criminal
> conduct if at the time of such conduct as a result
> of mental disease or defect he is unable either to

7

appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

"(b) As used in this chapter, the term 'mental disease or defect' does not include an abnormality manifested only by re-repeated criminal or otherwise antisocial conduct." Section 95-501, R.C.M. 1947. (enacted by Sec. 1, Ch. 196, L. 1967).

A person was excused from criminal responsibility if he was <u>unable</u> to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. This was a stricter standard than the ALI model provision. Under the ALI standard, he was excused if he lacked <u>substantial capacity</u> to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. In addition, subsection (b) of 95-501, R.C.M. 1947 excluded from mental disease or defect any abnormality manifested only by repeated criminal or other antisocial conduct.

In 1979 the Montana Legislature repealed subsection (a), leaving subsection (b) in effect. This was termed an abolition of the insanity defense. In a similar manner in 1982, the Idaho Legislature abolished the insanity defense. See Idaho Code §18-207 (1982). In these two states, other procedures have been substituted for the independent, affirmative defense of insanity. See Bender, <u>After Abolition: The Present State of the Insanity Defense in Montana</u>, 45 Mont. L. Rev. 133 (1984); sections 46-14-311 & -312, MCA; Idaho Code §19-2523 (1982).

Current Montana law, Title 46, Chapter 14, Part 1, states:

Relevance of Mental Disease or Defect

"46-14-101. <u>Mental disease or defect</u>. As used in this chapter, the term 'mental disease or defect' does not include an abnormality manifested only by repeated criminal or other antisocial conduct.

"46-14-102. <u>Evidence of mental disease or defect admissible to prove state of mind</u>. Evidence that

the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did or did not have a state of mind which is an element of the offense.

"46-14-103. Mental disease or defect excluding fitness to proceed. No person who, as a result of mental disease or defect, is unable to understand the proceedings against him or to assist in his own defense shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity endures."

In Montana, at this time, evidence of a mental disease or defect is admissible prior to trial to prove that the defendant is unfit to proceed. During trial, evidence of a mental disease or defect is admissible to prove that a defendant lacked a particular state of mind which is an element of the crime. The former concept of inability to appreciate the criminality or to conform conduct to the requirements of law is now contained only in the sentencing statute.

"46-14-311. Consideration of mental disease or defect in sentencing. Whenever a defendant is convicted on a verdict or a plea of guilty and he claims that at the time of the commission of the offense of which he was convicted he was suffering from a mental disease or defect which rendered him unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, the sentencing court shall consider any relevant evidence presented at the trial and shall require such additional evidence as it considers necessary for the determination of the issue, including examination of the defendant and a report thereof as provided in 46-14-202 and 46-14-203."

For the first time since 1967, this Court is faced with the need for defining mental disease or defect without the repealed language of former section 95-501, R.C.M. 1947. In addition, we must determine the proper application of the alternative sentencing statute in a case where the sentencing judge has concluded that the defendant does suffer from a serious mental disorder, but that his mental condition did not render him unable to appreciate the criminality of his

9

conduct or unable to conform his conduct to the requirements of the law.

III

Did the court err in instructing the jury on the law of mental disease or defect?

Defendant contends that section 46-14-101, MCA creates a conclusive presumption, the effect of which was to tell the jury that they should accept as true, without proof, that a mental disease or defect is not an abnormality manifested only by repeated criminal or antisocial behavior. Defendant contends that if the jury found that he had a mental disease manifested only by antisocial or criminal behavior, then they were instructed to find that he did not suffer from a mental disease. Defendant argues that because his mental disease was manifested primarily by repeated criminal or antisocial behavior, the jury was misled to presume that he had the state of mind required as an element of each offense. He contends that section 46-14-101, MCA creates an unconstitutional, mandatory presumption as to defendant's mental state or intent. We disagree.

The jury was instructed on the presumption of innocence and the State's burden of proving each and every element beyond a reasonable doubt. In addition, the jury was specifically instructed regarding mental disease or defect and criminal intent:

> "You must decide 1. whether the defendant had a mental disease or defect at the time of the acts alleged in the Information before you, and 2. whether, if he had a mental disease or defect, it prevented him from having any of the states of mind required as an element of the offense charged, in this case, purpose or knowledge.

> "You are to determine the meaning of the phrase 'mental disease or defect,' and in so doing you may apply the common meanings of these words in your experience in life, and you may be guided by the testimony you find credible and relevant. However,

10

the term 'mental disease or defect' does not include an abnormality manifested only by repeated criminal or antisocial conduct." Jury Instruction 20 (emphasis added to the part to which defendant objects).

Defendant's expert witness, Dr. John G. Watkins, a clinical psychologist, testified as follows:

"Q. Do you have an opinion as to whether the mental disease from which he suffers has manifested itself only through antisocial or criminal conduct?

"A. Well, the experiences in prison, the experience, for example, of seeing pig's head on the teacher or of seeing demons, hallucinations, that would not be antisocial behavior. It did not manifest itself in the stabbing.

"Q. We've also had testimony . . . that in prison Rodney would at times cut his fingers and smear blood on his face. Is that antisocial behavior?

"A. Well, it's masochistic behavior. It's psychotic like behavior. It's not considered social behavior to mutilate oneself . . ."

In addition to the extensive expert testimony on mental disease, the jury also heard testimony from defendant's brother and former cellmates that defendant refused to bathe; he slept fully clothed, on top of the bed covers, with the lights on so that evil spirits would not talk to him; that defendant sat within a pattern drawn on the floor of his prison cell in order to be protected from evil spirits; that he had a practice of cutting his fingers, smearing blood on his face, looking in the mirror and laughing; that he prayed and talked out loud to himself, waving his hands.

The definition of "antisocial conduct" is not an issue in this case. We shall not attempt to define that term, as now used in section 46-14-101, MCA. The evidence outlined above, including expert testimony regarding masochistic behavior, establishes that this is not a case where the mental disease was manifested only by criminal or antisocial conduct.

11

Defendant's proposed jury instruction paraphrased the first part of the jury instruction that was given. The second paragraph of the proposed instruction defined mental disease or defect as follows:

> "As used in this instruction, the terms mental disease or defect do not include an abnormality manifested only by repeated criminal or anti-social conduct. However, if you find there is other evidence that the defendant had a mental disease or defect, you may consider repeated criminal or other anti-social conduct as a manifestation of a mental disease or defect."

We find this to be a correct statement of the law. However, we do not agree with the defendant that the instruction given by the district court creates a Sandstrom-like presumption.

Here, there is substantial evidence of mental disease which was not manifested only by criminal or antisocial conduct. As a result there was no basis for the jury to presume, based on Jury Instruction No. 20, that the mental disease of the defendant should be disregarded. The jury was instructed to find the defendant not guilty if there was a reasonable doubt as to whether he acted knowingly or purposely. The instructions given did not allow the jury to presume that criminal intent existed. In fact, the jury was specifically instructed to the contrary. While the defendant's proposed instruction was correct as a matter of law, we hold that the refusal to give that instruction does not constitute reversible error.

Defendant also challenges Jury Instruction No. 31, which states:

> "The defendant is presumed to be sane. However, this presumption is rebutted and disappears whenever reliable evidence is introduced that raises a reasonable doubt as to the defendant's sanity. It makes no difference from which side this evidence comes.
>
> "From the moment it appears, the burden is at once upon the State to establish the responsibility of the defendant, beyond a reasonable doubt."

12

This is an edited version of an instruction proposed by the defendant. No objection to the court's amendment was made by defense counsel. Having failed to object or to identify any specific grounds for objection, defendant's challenge on appeal must fail. See State v. Walker (1966), 148 Mont. 216, 223, 419 P.2d 300, 304.

The jury was instructed on (1) the State's burden of proving each and every element of each charged offense beyond a reasonable doubt; (2) the State's responsibility of proving that the defendant acted purposely or knowingly in committing the charged offenses; (3) that mental disease or defect may prevent a defendant from acting purposely or knowingly; (4) that the jury may draw reasonable inferences and conclusions from the witnesses' testimony about defendant's appearance, behavior, speech and actions; and (5) in determining whether the required state of mind for each offense had been proven beyond a reasonable doubt, the jury may consider testimony concerning the presence and nature of any mental disease from which the defendant claims to have suffered at the time of the offense.

Read together, the jury instructions properly informed the jury on the law of mental disease or defect and the burden on the part of the State to establish the necessary criminal intent beyond a reasonable doubt. Whether his mental disease affected the defendant's ability to act with purpose and knowledge was a question of fact for the jury. The jury answered that question by returning guilty verdicts on each count.

We hold that the trial court properly instructed the jury on the law of mental disease or defect and the State's burden of proof. We affirm the jury verdicts.

13

IV

Did the District Court act properly when it sentenced the defendant to 300 years in Montana State Prison without possibility of parole or furlough?

The consideration to be given to mental disease or defect in sentencing is contained in section 46-14-311, MCA. As noted above, this section now requires the sentencing judge to determine whether the defendant was able to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

Section 46-14-312, MCA specifies the sentencing alternatives:

"Sentence to be imposed. (1) If the court finds that the defendant at the time of the commission of the offense of which he was convicted did not suffer from a mental disease or defect as described in 46-14-311, it shall sentence him as provided in Title 46, chapter 18.

"(2) If the court finds that the defendant at the time of the commission of the offense suffered from a mental disease or defect as described in 46-14-311, any mandatory minimum sentence prescribed by law for the offense need not apply and the court shall sentence him to be committed to the custody of the director of the department of institutions to be placed in an appropriate institution for custody, care, and treatment for a definite period of time not to exceed the maximum term of imprisonment that could be imposed under subsection (1). The authority of the court with regard to sentencing is the same as authorized in Title 46, chapter 18, provided the treatment of the individual and the protection of the public are provided for.

"(3) A defendant whose sentence has been imposed under subsection (2) may petition the sentencing court for review of the sentence if the professional person certifies that the defendant has been cured of the mental disease or defect. The sentencing court may make any order not inconsistent with its original sentencing authority except that the length of confinement or supervision must be equal to that of the original sentence. The professional person shall review the defendant's status each year."

The choice of either sentencing alternative is dependent upon a prior determination of criminal responsibility or

14

irresponsibility, as defined by section 46-14-311, MCA. In making this determination, the sentencing court shall consider any relevant evidence presented at the trial and "such additional evidence as it considers necessary." Section 46-14-311, MCA. "The judge is not limited to a consideration of evidence presented at the trial." State v. Doney (Mont. 1981), 636 P.2d 1377, 1385, 38 St.Rep. 1707, 1716.

> "[The] defendant must prove to the satisfaction of the sentencing court that at the time of the commission of the offense of which he was convicted, he was suffering from a mental disease or defect which rendered him unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.' . . . A determination of the existence of mental disease . . . rests within the discretion of the sentencing judge." Doney, 636 P.2d at 1385, 38 St.Rep. at 1716 (emphasis added).

In addition to the lay witness and expert testimony presented at trial in this case, the court had psychological evaluations and a pre-sentence investigation report available to it. Defense witness, Dr. John G. Watkins, was the only expert who specifically concluded that the defendant lacked control over his criminal conduct. Each of the other psychologists and one psychiatrist supplied substantial evidence from which the court could conclude that the defendant was able to appreciate the criminality of his conduct and had the ability to conform his conduct to the requirements of the law.

Defendant argues that once the sentencing judge determined that he suffered from a "serious mental disorder," the court was statutorily required to commit him to the custody of the Department of Institutions to be placed in an appropriate mental institution. He further argues that sentencing a mentally ill defendant to prison for 300 years

15

without possibility of parole or furlough constitutes cruel and unusual punishment. We disagree.

The American Psychiatric Association and the National Mental Health Association concur "that expert witnesses should testify within their areas of specialized knowledge and not to the ultimate legal issues of whether or not the accused was legally insane at the time of the alleged act." National Mental Health Association, Myths & Realities: A Report of the National Commission on the Insanity Defense 41 (March, 1983).

A medical diagnosis of mental illness that requires treatment and a legal finding of mental disease that relieves criminal responsibility are distinguishable. It is possible to be diagnosed as suffering from a mental illness for medical and treatment purposes and, from a legal standpoint, still be criminally culpable. If the mental disease does not satisfy the definition in section 46-14-311, MCA, then a sentence of imprisonment may properly be imposed.

In State v. Mercer (Mont. 1981), 625 P.2d 44, 38 St.Rep. 312, the defendant appealed a conviction for aggravated assault and a sentence of 20 years imprisonment. Expert testimony established that Mercer suffered from an untreatable mental disorder that prevented him from conforming his behavior to social norms, but that the disorder was episodic. His mental disease had purportedly been evident for many years. The State established that defendant's story about another being taking control of his body began only when investigation of the case began to center on him. The jury found him guilty. The judge determined that Mercer was "in full possession of his mental capacity and not suffering from mental disease or defect which could render him incapable of appreciating the

16

criminality of his conduct or the ability to conform his conduct to the requirements of law." Mercer, 625 P.2d at 50, 38 St.Rep. at 318. For the protection of society, defendant was sentenced as a dangerous offender to 20 years imprisonment.

We noted in Mercer that the statutory scheme dealing with the mental competency of criminal defendants "does not prescribe special rules for sentencing a defendant who was sane at the time of his crime, but who may be insane at other times." Mercer, 625 P.2d at 50, 38 St.Rep. at 319. We concluded that under circumstances where a defendant has not been adjudicated insane, a sentence of imprisonment does not violate any statutory or constitutional law.

Defendant cites the following language in support of his contention that he was entitled to be committed to Warm Springs State Hospital rather than sentenced to Montana State Prison:

> ". . . The defendant was sentenced and classified as a dangerous offender based only on his past criminal behavior and his propensity for antisocial conduct. If, however, the court had determined that the defendant were mentally deranged but sentenced him nevertheless to a penal institution without providing for adequate treatment, the defendant may have had grounds to argue that the sentence violated constitutional prohibitions against cruel and unusual punishment." Mercer, 625 P.2d at 51, 38 St.Rep. at 319.

We find this argument unpersuasive. The quoted hypothetical is dicta in Mercer. In addition, section 46-14-311, MCA requires more than just a finding of mental disease. Where mental disease exists, the court must also determine its effect upon the defendant's ability to appreciate criminality and capacity to conform his conduct, i.e. whether the disease meets the standard of impairment set forth in section 46-14-311, MCA.

17

In State v. Doney (Mont. 1981), 636 P.2d 1377, 38 St.Rep. 1707, the defendant was convicted of attempted robbery and aggravated assault and sentenced to Montana State Prison for two 10 year terms to be served concurrently. Defendant testified that he had no recollection of the assault. He claimed that his intoxicated and drugged condition made him incapable of forming the requisite mental state. The sentencing court refused defendant's request to be committed rather than imprisoned.

This Court stated on appeal:

". . . Before such commitment will be ordered, defendant must prove to the satisfaction of the sentencing court that 'at the time of the commission of the offense of which he was convicted he was suffering from a mental disease or defect which rendered him unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.' Sections 46-14-311 and 46-14-312, MCA. The sentencing judge is not limited to a consideration of evidence presented at the trial. A determination of the existence of mental disease or defect under these sections rests within the discretion of the sentencing judge.

"If the mental disease or defect described in section 46-14-311, MCA, is found, the judge must order the commitment described in section 46-14-312(2). . . .

. . .

"Section 46-14-312(1), MCA, provides that if the mental disease or defect described in section 46-14-311, MCA, is not found by the sentencing judge, defendant shall be sentenced as provided in Title 46, chapter 18." Doney, 636 P.2d at 1385, 38 St.Rep. at 1716.

Affirming the sentence of imprisonment, we held:

"[T]he determination whether defendant does suffer from such mental disease or defect lies within the discretion of the sentencing judge, after his evaluation of the trial evidence and any other evidence he may deem necessary. The sentencing judge was not persuaded that defendant suffered from a mental disease or defect within the meaning of section 46-14-311, MCA. He acted well within his discretion in denying defendant's request that he be committed pursuant to section 46-14-312(2), MCA." Doney, 636 P.2d at 1386, 38 St.Rep. at 1717 (emphasis added).

In each reference to mental disease or defect, this Court stressed that the disease or defect must be one described in section 46-14-311, MCA.

Here, the sentencing court found that defendant's "serious mental disorder" did not meet the standard set forth in section 46-14-311, MCA. The court further found that the defendant "is not willing to conform his behavior to the requirements of law."

We hold that the sentencing court did not abuse its discretion in determining that defendant's mental disorder failed to meet the standard set forth in section 46-14-311, MCA. We find no error in the court's sentencing the defendant to imprisonment under section 46-14-312(1), MCA.

Defendant next contends that the sentence of an individual who is mentally ill to the Montana State Prison for a term of 300 years without the possibility of parole or furlough is cruel and unusual punishment and a violation of the Eighth Amendment of the U.S. Constitution and Article II, Section 22, 1972 Montana Constitution. Defendant argues that he was sentenced not for his behavior, but for his illness.

The term of 300 years is within the statutory maximum allowable for a persistent felony offender. Section 46-18-502(2), MCA. As this Court stated in State v. Metz (1979), 184 Mont. 533, 536, 604 P.2d 102, 104:

> "Defendant's sentence is within the maximum allowable by the persistent felony offender statute. . . . As a general rule, sentences within the maximum statutory limits do not violate the Eighth Amendment. . . . Defendant must establish that his sentence is an exception to this rule. . . . The evidence presented here does not establish that the length of the sentence was unconstitutional.
>
> "The court's 100 year sentence may in defendant's eyes seem inequitable, but it is not so shocking or oppressive as to be cruel and unusual punishment. Challenges to the equitability of a sentence as

19

opposed to its legality are properly directed to the Sentence Review Board." (citations omitted)

Section 46-18-202(2), MCA authorizes the sentencing court to impose restrictions, as part of the sentence, making the defendant ineligible for parole or participation in the supervised release program. Such restrictions may be imposed where the court finds it necessary to protect society and states the reasons for the restriction. Here, the court stated ten reasons for its designation of defendant as a dangerous offender and imposition of the restrictive sentence:

"a. Protection of society.

"b. No chance of rehabilitation.

"c. Defendant was convicted by jury of all the acts alleged in the information.

"d. Defendant's earlier record.

"e. Defendant's behavior at trial and at sentencing.

"f. Testimony at trial as to the Defendant's history.

"g. Defendant is not willing to conform his behavior to the requirements of law.

"h. Defendant is a very dangerous person and will continue to be such a person.

"i. It is unlikely that the Defendant will ever be non-violent or not commit further acts that were a source of the trial.

"j. There is no treatment program which will alter the Defendant's behavior."

Four of the five psychological and psychiatric evaluators specifically concluded that the defendant was able to appreciate the criminality of his conduct and to conform his conduct to the requirements of law. The one expert whose diagnosis differed from the others agreed with the others as to defendant's dangerousness and propensity for criminal violence in the future. In fact, he concluded that the

20

defendant has the capacity to carry out a "Manson" type homicide. All of the evaluations support the court's finding that defendant is a very dangerous person and will continue to be a danger to society.

Regarding disposition, the various experts advised the court as follows:

"There is no treatment facility in the state of Montana which is likely to be more suitable for the resolution of Mr. Watson's psychological problems than that available at the Montana State Prison. Mr. Watson's psychological disorders are not of the type or severity which would make it in the state's interest to commit him to a treatment facility such as Warm Springs State Hospital."

". . . I am very concerned about the degree of danger which he can pose if his very tenuous restraining capacity were taxed due to stress, fatigue, or drugs. I would view him as a very dangerous man who should be handled with the strictest kinds of controls, whatever the outcome."

". . . His poor social and vocational adjustment in a context of chronic substance abuse and frequent lawbreaking, are consistent with diagnosis of personality disorders. The prognosis for treatment is poor and he should be regarded as having a strong potential for further violent, impulsive behavior."

"It is essential for the protection of others as well as himself that he be under institutional control for a long time. His violent behavior (as contrasted with his burglarizings) is best described as a psychiatric illness. His condition suggests the need for intensive, individual therapy, perhaps abreactions to release the repressed rage. However, neither Warm Springs State Hospital or the Deer Lodge Prison is probably prepared to give such treatment. Institutions such as Atascadero or Vacaville in California designed for the criminally insane are best equipped in this respect.

"Where-ever he is confined it is important for the protection of society that he not merely be given a parole or discharge after a few months, or even a few years, of good, overt behavior . . ."

"He does not indicate symptoms of psychosis. There is a failure to accept social norms with respect to lawful behavior. There is irritability and impulsivity. There is irresponsibility. There is chronic use and abuse of alcoholic beverages.

. . .

21

"The defendant, Rodney Watson, does not suffer from serious mental disease or defect. . .."

"Mr. Watson has the ability to appreciate the criminality of his conduct, to conform his conduct to the requirements of law at the time of the criminal conduct charged."

The pre-sentence investigation report recommended that the defendant be confined in Montana State Prison for the maximum time allowable under the law, based upon consideration of the defendant's prior criminal history, his past failures on parole supervision, the violent nature of his last crime, and the fact that there is a poor prognosis for treatment of his mental disorder.

We hold that the sentencing court did not abuse its discretion in imposing a sentence with restrictions that the defendant shall be ineligible for parole or participation in the supervised release program while serving his term.

The fact that the sentencing judge in this case requested that the defendant be transferred to another facility, should the Prison Warden deem it appropriate, indicates the court's concern regarding post-dispositional treatment of this offender. It also recognizes the possibility that more appropriate treatment for defendant's particular condition, than that available at the Prison, may become available at a later date; at which time, custody of the defendant could be transferred.

Defense counsel asserted at the sentencing hearing that a California facility for the criminally insane might be able to treat the defendant's disorder; however, no evidence of available treatment or agreement to enter into a Western Interstate Corrections Compact was presented.

The record contains no evidence of the type or degree of psychological treatment that might be made available to the defendant at the Montana State Prison, nor any evidence other

22

than defense counsel's assertions that such treatment would be inadequate.

Defendant's argument that the prison is incapable of meeting his particular needs is premature. In the event of deficient care, defendant has the alternative of legal proceeding against the State. State v. Austad (1982), 197 Mont. 70, 101, 641 P.2d 1373, 1390.

We hold that the sentence given the defendant does not constitute the infliction of cruel and unusual punishment. Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

Mr. Justice John C. Sheehy, dissenting:

I dissent principally on two grounds, one, that the court committed instructional error with respect to mental disease or defect, and two, that the sentence imposed is cruel and unusual punishment.

I.

For the reader to understand this issue, I set out the provisions of section 46-14-101, MCA:

> "Mental disease or defect. As used in this chapter, the term 'mental disease or defect' does not include an abnormality manifested only by repeated criminal or other antisocial conduct."

The obverse of section 46-14-101, should be that mental disease or defect does include abnormalities manifested by other than repeated criminal or other antisocial conduct.

Everybody that has had anything to do with this case admits that the defendant is suffering, at least medically, from a mental disease or defect. All the experts who testified at the trial agreed on this point. The state prosecutors at the county and state level agree, the District Court agreed, and now this Court, through its majority opinion also agrees. In that situation, we must ask ourselves whether the jury was properly instructed so that it could determine whether at the time he committed the alleged offense he was suffering from a mental disease or defect so that he could not have the particular state of mind that is an essential element of the offense charged.

The court's instruction on this point is as follows:

"INSTRUCTION NO. 20

> "You must decide 1. whether the defendant had a mental disease or defect at the time of the acts alleged in the Information before you, and 2. whether, if he had a mental disease or defect, it

- 24 -

prevented him from having any of the states of mind required as an element of the offense charged, in this case, purpose or knowledge.

"You are to determine the meaning of the phrase 'mental disease or defect,' and in so doing you may apply the common meanings of these words and your experience in life, and you may be guided by the testimony you find credible and relevant. However, the term 'mental disease or defect' does not include an abnormality manifested only by repeated criminal or other antisocial conduct." (Emphasis added.)

Obviously, as far as it went, the instruction is in accord with section 46-14-101, MCA. However, the defense offered a clarification to the instruction which would have added the following language:

"As used in this instruction, the terms mental disease or defect do not include an abnormality manifested only by repeated criminal or anti-social conduct. However, if you find there is other evidence that the defendant had a mental disease or defect, you may consider repeated criminal or anti-social conduct as a manifestation of a mental disease or defect."

The District Court denied the addition to the instruction as proposed by the defendant. I think a serious error occurred at that point.

This is not spoken in criticism of the district judge. I think the District Court was faced with a statute that is too vague and ambiguous to be applied. The point that the defendant's offered instruction was hoping to meet is this: if the only manifestation of the abnormality is repeated "criminal or other antisocial conduct" then the jury may not consider that the defendant acted under the influence of a mental disease or defect; but if in fact there are other manifestations of abnormality, as all agree there are in this case, then the jury may consider the repeated criminal and antisocial conduct as further manifestation of the abnormality.

- 25 -

The term "other antisocial conduct" itself is too broad to be constitutionally applied. Criminal conduct is, of course, antisocial. What other conduct may be regarded as antisocial? By definition, one who is averse to the society of others is antisocial. The term also includes behavior which is hostile or harmful to organized society or which is marked by behavior deviating sharply from the <u>social norm</u>. Webster's New Collegiate Dictionary (1981). Thus, antisocial conduct runs the broad spectrum from criminal conduct through vandalism and even to those Montanans who "like their fellow men the best when they are scattered some."

The term "antisocial conduct" is too broad and vague to be constitutionally applied. Without a standard to guide the jury based on the clause, the jury was left with no guidance in the application of the law to the abnormality claimed by the defendant. The instructions given to the jury were in effect a presumption in the vice of <u>Sandstrom</u>, because some jurors may have excluded all of the defendant's abnormal behavior as antisocial, and therefore not to be considered as a manifestation of his mental disease or defect.

It is true that the defendant did not offer, as I search the record, an instruction defining "antisocial conduct" in the sense of the statute. Undoubtedly the defendant could not have found such a standard, but at least the clarification offered should have been given to the jury that if the defendant did engage in conduct which was abnormal, then the jury might also consider his repeated criminal violations, and his repeated "antisocial conduct."

There is a serious statutory hole here that requires filling up by the legislature. In the meantime, it is the duty of this Court to protect the defendant from the

consequences of the District Court taking from the jury all consideration of abnormal behavior simply because it falls within the categories of criminal or antisocial conduct.

II.

As serious to me as the instructional error is the punishment meted out to the defendant here, three 100 year terms, to be served consecutively, without possibility of furlough or parole.

It is evident that the District Court decided to put the defendant "on ice" for the remainder of his life. Worse, he will be preserved in his present state, without hope of treatment until death overtakes him. To me, this is cruel and unusual punishment.

Punishment for crimes may be "cruel and unusual" because of its barbarity, or because it is "excessive" or "disproportionate" to the offense. Solem v. Helm (1983), 462 U.S. ___; Edmund v. Florida (1972), 458 U.S. 782; Coker v. Georgia (1977), 433 U.S. 584; Estelle v. Gamble (1977), 429 U.S. 97; Gregg v. Georgia (1976), 428 U.S. 153.

The term "cruel and unusual punishment" comes from the Eighth Amendment to the United States Constitution. The Eighth Amendment is based upon the "evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles (1958), 356 U.S. 86, 101, ___ S.Ct. ___, ___ L.Ed.2d ___. Montana, in adopting its 1972 Constitution, purportedly showed it was maturing by adopting Art. II, § 28 to the effect that laws for the punishment of crime shall be founded on the principles of prevention and reformation. Punishment, therefore, ought to have a two-pronged objective: one, preventing the defendant from further crime, but two, directed toward his rehabilitation. By salting the defendant

- 27 -

away for the rest of his natural life, the court has undoubtedly prevented him from future crime against persons outside the prison walls; but the District Court has also determined that he is incapable of rehabilitation. The only evidence of his inability to rehabilitate is his mental illness. That is why by sentencing him to the Montana State Prison instead of to Warm Springs, the District Court insured that he would never be rehabilitated through medical treatment. From the sentence, therefore, I determine that its imposition is at once barbarous and excessive.

As the appellant noted in his brief, the sentence is also disproportionate. Statistics compiled by the Sentence Review Board of our Court in 1980 show that of the 352 convictions for aggravated assault between July 1, 1978 and December 12, 1979, only six individuals received prison terms in excess of 20 years. The defendant was given 100 years, pursuant to the persistent felony offender statute without possibility of parole or furlough for his conviction on the charge of aggravated assault against Andrew Floberg. Likewise, 947 people were convicted of burglary between July 1, 1978 and December 12, 1979. Of those 947, 3 received sentences of 40 to 50 years, probably under the persistent felony offender statutes. None received sentences in excess of 50 years. The defendant, however, received a sentence of 100 years without the possibility of parole or furlough on his burglary conviction for entering Melissa Smith's apartment and stealing her purse. The Sentence Review Board compiled no statistics for the offense of attempted deliberate homicide in its 1980 report. I think it rather obvious that the sentences here are disproportionate and I would reverse on that ground also.

- 28 -

I would reverse the conviction and remand for a new trial.

```
                                    John G. Shelley
                                    Justice
```

Mr. Justice Daniel J. Shea dissents and will file a written dissent later.

DISSENT OF MR. JUSTICE DANIEL J. SHEA

No. 83-325

STATE OF MONTANA,

Respondent,

vs.

RODNEY EUGENE WATSON,

Appellant.

FILED

JAN 6 - 1985

Ethel M. Harrison
CLERK OF SUPREME COURT
STATE OF MONTANA

DATED: January 6, 1985

Mr. Justice Daniel J. Shea, dissenting:

I agree with the dissent of Mr. Justice Sheehy, and the arguments expressed therein. I feel that jury instruction no. 20, which merely paraphrases the relevant statutory language, is confusing and did not fully inform the jury of the legal concepts involved. I have repeatedly stressed that jury instructions which merely set forth statutory language verbatim are not always sufficient. If the language of the statute is vague or unclear as to its meaning, as is the statute in this case, additional instructions must be given by the trial court to help the jury fully understand the relevant legal principles. The incomplete instruction given in this case could easily mislead the jury into totally disregarding the defendant's criminal or antisocial behavior as an indication of mental disease or defect, even if there was additional evidence supporting the claim of mental disease.

Further, I agree that sentencing the defendant to 300 years in the Montana State Prison without the possibility of parole or treatment constitutes cruel and unusual punishment. As Justice Sheehy points out, the 1972 Constitution, Art. II, § 28 provides that punishment for crimes shall be based on prevention _and_ _reformation_. While the preventive aspects of the 300-year sentence are apparent, any attempt to reform the defendant is totally lacking.

I would reverse the defendant's conviction and remand this cause for a new trial.

_____
                    Justice