No. 83-410

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

---

STATE OF MONTANA,

       Plaintiff and Respondent,

 -vs-

JERRY T. KORELL,

       Defendant and Appellant.

---

APPEAL FROM: District Court of the Fourth Judicial District,
In and For the County of Ravalli,
The Honorable Robert M. Holter, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Robinson, Doyle & Bell; John C. Doyle argued,
        Hamilton, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
        Kimberly A. Kradolfer argued, Asst. Atty. General
        Robert B. Brown, County Attorney, Hamilton, Montana
        Larry Johnson argued, Deputy County Atty., Hamilton

---

Submitted: October 2, 1984

Decided: November 16, 1984

Filed: NOV 16 1984

*Ethel M. Harrison*

Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Jerry Korell appeals the judgment of the Ravalli County District Court finding him guilty of attempted deliberate homicide and aggravated assault. Korell was sentenced to concurrent sentences of thirty-five and fifteen years at the Montana State Prison. Korell's defense at trial was that he lacked the requisite criminal mental state by reason of his insanity. On appeal his primary contention is that the Montana statutory scheme deprived him of a constitutional right to raise insanity as an independent defense.

Jerry Korell is a Viet Nam veteran who had several disturbing experiences during his tour of duty. The exact nature of the trauma was never fully documented. Friends and family agree that he was a different person when he returned from the service. Between Korell's honorable discharge in 1970 and the present events, he was twice admitted to VA hospitals for psychological problems and treated with anti-psychotic drugs. In 1976 he was jailed briefly in Boise, Idaho, for harassing and threatening the late Senator Frank Church.

The basic nature of Korell's problems was that he would periodically slip into paranoid phases during which he had trouble relating to male authority figures. His mental health varied dramatically. In the poorer times his family entertained thoughts about having him civilly committed. His VA hospitalizations were voluntary and neither of the stays were of such length that he was fully evaluated or treated.

In 1980 Korell entered a community college program for echocardiology in Spokane, Washington. Echocardiology is the skill associated with recording and interpreting sonograms of

the heart for diagnostic purposes. In March 1982 he was sent to Missoula to serve a clinical externship at St. Patrick's Hospital. Korell's supervisor at the hospital was Greg Lockwood, the eventual victim of this crime.

Korell's relationship with Lockwood deteriorated for a variety of work-related reasons. Foremost was Korell's belief that he was worked excessively by Lockwood. At this time Korell was subjected to what expert testimony labeled psychological stressors: a divorce by his wife, financial problems and the pressures of graduation requirements.

In April 1982 Korell wrote a letter to the hospital administrator complaining about his supervisor, Lockwood. Korell was transferred to an externship in Spokane, and Lockwood was placed on probation. Both men retained very bitter feelings about the incident. Lockwood stated to friends he would see to it that Korell was never hired anywhere in echocardiology. Korell may have learned of Lockwood's statements.

Korell's actions in the next two months indicate a great deal of confusion. He set fire to a laundromat because he lost nine quarters in a machine and was tired of being ripped off. He set fire to a former home of his wife because she had bad feelings about it.

Released on bail from these incidents, he returned to Missoula in June 1982. Psychiatric testimony introduced at trial indicates that Korell felt he had to kill Lockwood before Lockwood killed him. He removed a handgun from a friend's home, had another acquaintance purchase ammunition, and on the evening of June 25, 1982, drove to the Lockwood home in the Eagle Watch area of the Bitterroot Valley. Shirley Lockwood, Greg's wife, saw the unfamiliar vehicle

3

approach the house. Greg Lockwood was lying on the living room floor at the time watching television. Korell entered the house through a side door and began firing. Although wounded, Greg Lockwood managed to engage the defendant in a struggle. A shot was fired in the direction of Lockwood's wife. Korell grabbed a kitchen knife and both men were further injured before Lockwood was able to subdue Korell.

Korell was charged with attempted deliberate homicide and aggravated assault. The defendant gave notice of his intent to rely on a mental disease or defect to prove that he did not have the particular state of mind which is an essential element of the offense charged. Prior to trial he sought a writ of supervisory control declaring that he had a right to rely on the defense that he was suffering from a mental disease or defect at the time he committed the acts charged. The writ was denied by this Court on December 20, 1982, and the case proceeded to trial.

Several psychologists and psychiatrists testified on Korell's mental condition. The defense sought to establish by its expert witnesses and numerous character witnesses that Korell was a disturbed man who was psychotic at the time the crimes were committed. It was argued that his actions when he entered the Lockwood home were not voluntary acts. The State produced its own expert witnesses who testified on Korell's mental condition. Four doctors testified in all, two for the prosecution and two for the defense. Three of the four stated Korell had the capacity to act knowingly or purposely, the requisite mental state for the offenses, when he entered the Lockwood home.

Without giving prior notice, the State produced Cedric Hames as a rebuttal witness who testified that he purchased

ammunition for the defendant several days before the shooting. A motion for mistrial was made by the defense. The court denied the motion but offered the defense a continuance. The offer was refused by defendant's counsel.

In keeping with Montana's current law on mental disease or defect, the jury was instructed that they could consider mental disease or defect only insofar as it negated the defendant's requisite state of mind. The jury returned guilty verdicts for the attempted deliberate homicide and aggravated assault.

On appeal the defendant presents the following issues:

1. Is there a constitutional right to raise insanity as an independent defense to criminal charges?

2. Was the State's rebuttal testimony of Cedric Hames properly admitted?

3. Was the jury properly instructed on the issue of voluntariness?

4. Did the District Court fail to consider defendant's mental condition at sentencing?

5. Did the District Court act within its discretion in awarding fees to defendant's court-appointed attorney?

I. CONSTITUTIONAL CHALLENGE

A. Background

In 1979 the Forty-Sixth Session of the Montana Legislature enacted House Bill 877. This Bill abolished use of the traditional insanity defense in Montana and substituted alternative procedures for considering a criminal defendant's

5

mental condition. Evidence of mental disease or defect is now considered at three phases of a criminal proceeding.

Before trial, evidence may be presented to show that the defendant is not fit to proceed to trial. Section 46-14-221, MCA. Anyone who is unable to understand the proceedings against him or assist in his defense may not be prosecuted. Section 46-14-103, MCA.

During trial, evidence of mental disease or defect is admissible when relevant to prove that, at the time of the offense charged, the defendant did not have the state of mind that is an element of the crime charged, e.g., that the defendant did not act purposely or knowingly. Section 46-14-102, MCA. The State retains the burden of proving each element of the offense beyond a reasonable doubt. Defendant may, of course, present evidence to contradict the State's proof that he committed the offense and that he had the requisite state of mind at that time.

Whenever the jury finds that the State has failed to prove beyond a reasonable doubt that the defendant had the requisite state of mind at the time he committed the offense, it is instructed to return a special verdict of not guilty "for the reason that due to a mental disease or defect he could not have a particular state of mind that is an essential element of the offense charged. . . ." Section 46-14-201(2), MCA.

Finally at the dispositional stage following the trial and conviction, the sentencing judge must consider any relevant evidence presented at the trial, plus any additional evidence presented at the sentencing hearing, to determine whether the defendant was able to appreciate the criminality of his acts or to conform his conduct to the law at the time

he committed the offense for which he was convicted. Section 46-14-311, MCA.

The sentencing judge's consideration of the evidence is not the same as that of the jury. The jury determines whether the defendant committed the offense with the requisite state of mind, e.g., whether he acted purposely or knowingly. The sentencing judge determines whether, at the time the defendant committed the offense, he was able to appreciate its criminality or conform his conduct to the law.

If the court concludes the defendant was not suffering from a mental disease or defect that rendered him unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, normal criminal sentencing procedures are invoked. Section 46-14-312(1), MCA.

Whenever the sentencing court finds the defendant was suffering from mental disease or defect which rendered him unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, mandatory minimum sentences are waived. The defendant is committed to the custody of the director of institutions and placed in an appropriate institution for custody, care and treatment not to exceed the maximum possible sentence. Section 46-14-312(2), MCA. As a practical matter, this means the defendant may be placed in the Warm Springs State Hospital under the alternative sentencing procedures. The institutionalized defendant may later petition the District Court for release from the hospital upon a showing that the individual has been cured of the mental disease or defect. If the petition is granted, the court must transfer the defendant to the state prison or place the defendant under alternative confinement or supervision. The length of this

7

confinement or supervision must equal the original sentence. Section 46-14-312(3), MCA.

In summary, while Montana has abolished the traditional use of insanity as a defense, alternative procedures have been enacted to deal with insane individuals who commit criminal acts.

Much has been written concerning criminal responsibility and insanity. Professor Norval Morris commented that "[r]ivers of ink, mountains of printer's lead, forests of paper have been expended on this issue. . . ." Morris, Psychiatry and the Dangerous Criminal, 41 S.Cal.L.R. 514, 516 (1968). Yet there is a paucity of judicial opinions construing the constitutional parameters of the traditional insanity defense or the various reform proposals. This case is the first direct constitutional challenge to Montana's abolition of the affirmative insanity defense and adoption of alternative procedures in its place.

Four opinions of this Court have addressed the post-1979 law on mental disease or defect: State v. Mercer (Mont. 1981), 625 P.2d 44, 38 St.Rep. 312; State v. Doney (Mont. 1981), 636 P.2d 1377, 38 St.Rep. 1707; State v. Zampich (Mont. 1983), 667 P.2d 955, 40 St.Rep. 1235; and State v. Watson (Mont. 1984), 686 P.2d 879, 41 St.Rep. 1452.

In Mercer, supra, we affirmed the aggravated assault conviction of a man found guilty of attacking a school teacher. The defendant, Bryan Mercer, suffered episodic mental illness. While broad questions concerning the mental disease defense were raised, we did not reach these issues. Mercer argued that sentencing to prison a man suffering from severe mental illness violates the constitutional ban against cruel and unusual punishment. We found no authority holding that

imprisonment rather than medical treatment of a person who claims to be insane, but has not been adjudicated insane, constitutes cruel and unusual punishment. We held that the jury verdict convicting the defendant was supported by substantial evidence and that the defendant had failed to show any statutory or constitutional violation by the sentencing judge.

Following Mercer, this Court heard the appeal of another aggravated assault conviction in Doney, supra. The defendant Doney stabbed the night clerk of a Havre hotel and relied on expert testimony during trial to show he was incapable of forming the requisite mental state of purposely or knowingly. On appeal he argued that the State was required to overcome his "preponderance of evidence" by proving his sanity beyond a reasonable doubt, as well as the fact that he had acted purposely and knowingly. We rejected that notion:

> ". . . It is sufficient that the State prove beyond a reasonable doubt the existence of the mental state that is an essential element of each of the offenses charged. Implicit in the jury's conviction is its conclusion that the defendant possessed the requisite mental state, and therefore had the capacity to form that mental state. The State has met the requirements of Montana law." 636 P.2d at 1382.

Our holding in Doney clarified prior language in Mercer, where the majority had noted:

> ". . . Therefore, the jury knew that the State had the burden of proving beyond a reasonable doubt that the defendant was sane and capable of acting purposely or knowingly at the time of the crime." 625 P.2d at 49.

While some jurisdictions, most notably the federal courts, have given the prosecution the burden of proving the defendant's sanity beyond a reasonable doubt, such practice

is not the rule in Montana. Prior to 1979, insanity was treated as an affirmative defense that had to be established by the accused by a preponderance of the evidence. State v. Caryl (1975), 168 Mont. 414, 425, 543 P.2d 389, 395. As the above discussion and our holding in Doney states, it is sufficient that the State prove beyond a reasonable doubt the requisite mental state, e.g., purposely or knowingly, that is an element of the offense charged.

The third decision of this Court to address the 1979 changes in the law on mental disease or defect was Zampich, supra. The defendant Zampich was charged with mitigated deliberate homicide for a tavern shooting in Carter, Montana. Zampich's psychologist testified that while the defendant may have been able to act purposely or knowingly, he may not have been acting voluntarily. We upheld the conviction on the ground that a jury instruction was given stating that a voluntary act is a material element of every offense and that the instructions read as a whole properly gave the jury notice of the defendant's theory of the case.

Finally in Watson, supra, the defendant argued that, because the primary symptoms of his mental disease were his repeated criminal or antisocial behavior and because the jury was instructed that mental disease does not include an abnormality manifested only by repeated criminal or other antisocial conduct, the jury was misled to presume that he had the requisite state of mind at the time he committed the offenses. See section 46-14-101, MCA.

Watson had entered two Missoula apartments, stabbed a sleeping woman thirty-five times and also stabbed a man who came to her rescue. Both victims survived the attacks. The defendant claimed a demon spirit possessed his body during

the acts. The jury convicted Watson of attempted deliberate homicide, aggravated assault and burglary. In accordance with our prior decisions, this Court concluded that the jury was properly informed of the State's burden of establishing beyond a reasonable doubt that Watson acted purposely or knowingly. The conviction was affirmed.

The sentencing judge found that Watson was suffering from a serious mental disorder, but also found that Watson was capable of appreciating the criminality of his conduct or conforming his conduct to the law but chose not to do so. See section 46-14-311, MCA. The court designated Watson a dangerous and persistent felony offender and sentenced him to 300 years imprisonment. Watson contended that his punishment was cruel and unusual in light of the fact that he suffered from a mental disorder. Relying on our prior decisions in Mercer and Doney, we upheld Watson's sentence, which was within the statutory maximum.

Review of our case law reveals that the constitutionality of the legislature's abolition of the affirmative defense of insanity has not previously been decided. Korell's present challenge is based on the Fourteenth Amendment guarantee of due process of law and the Eighth Amendment prohibition against cruel and unusual punishment.

B.  Due Process Considerations

1. Fundamental Rights.

The due process clause of the Fourteenth Amendment was intended in part to protect certain fundamental rights long recognized under the common law. Powell v. Alabama (1932), 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158. Appellant contends

that the insanity defense is so embedded in our legal history that it should be afforded status as a fundamental right. He argues that the defense was firmly established as a part of the common law long before our federal constitution was adopted and is essential to our present system of ordered liberty.

The United States Supreme Court has never held that there is a constitutional right to plead an insanity defense. Moreover, the Court has noted that the significance of the defense is properly left to the states:

> "We cannot cast aside the centuries-long evolution of the collection of inter-locking and overlapping concepts which the common law has utilized to assess the moral accountability of an individual for his antisocial deeds. The doctrines of actus reus, mens rea, insanity, mistake, justification, and duress have histori-cally provided the tools for a constantly shifting adjustment of the tension be-tween the evolving aims of the criminal law and changing religious, moral, philo-sophical, and medical views of the nature of man. This process of adjustment has always been thought to be the province of the States." Powell v. Texas (1968), 392 U.S. 514, 535-536, 88 S.Ct. 2145, 2156, 20 L.Ed.2d 1254, 1269.

An examination of the common law in a search for funda-mental rights can be misleading. When looking at concepts of insanity and criminal responsibility, one discovers a contin-uum of changing societal values and views. Commentators and courts have reached differing conclusions on the role of the insanity defense in the history of jurisprudence.

The English jurist Stephen observed:

> ". . . in very ancient times proof of madness appears not to have entitled a man to be acquitted, at least in case of murder, but to a special verdict that he committed the offense when mad. This gave him a right to a pardon. The same course was taken when the defence was killing by misadventure or in

12

self-defence." 2 Stephen, _A History of the Criminal Law of England_ 151 (1883).

This early thirteenth century practice of pardoning the insane was acknowledged in our _Watson_ decision and the historical discussion therein. Pardons were liberally granted and the practice represented a humane departure from earlier times of absolute liability for criminal acts.

Development of the _mens rea_ concept preceded recognition of the insanity defense. The Latin phrase _mens rea_ literally translates as "evil mind." It has also been interpreted as guilty mind, evil intent or criminal intent. Enlightened medieval jurists developed the _mens rea_ doctrine: without criminal intent, there can be no moral blameworthiness, crime or punishment. In the words of Henrici Bracton (d. 1268): "For a crime is not committed unless the will to harm be present." This principle has played a central role in all subsequent considerations of capacity, insanity, and moral and legal culpability.

For centuries evidence of mental illness was admitted to show the accused was incapable of forming criminal intent. Insanity did not come to be generally recognized as an affirmative defense and an independent ground for acquittal until the nineteenth century. Morris, _The Criminal Responsibility of the Mentally Ill_, 33 Syracuse L. R. 477, 500 (1982); American Medical Association, _The Insanity Defense in Criminal Trials and Limitations of Psychiatric Testimony_, Report of the Board of Trustees, at 27 (1983). The defense grew out of the earlier notions of _mens rea_.

We reject appellant's contention that from the earliest period of the common law, insanity has been recognized as a defense. What we recognize is that one who lacks the

13

requisite criminal state of mind may not be convicted or punished.

Three older state court decisions have found state statutes abolishing the insanity defense to be unconstitutional. State v. Lange (1929), 168 La. 958, 123 So. 639; Sinclair v. State (1931), 161 Miss. 142, 132 So. 581; State v. Strasburg (1910), 60 Wash. 106, 110 P. 1020. These decisions are distinguishable in that they interpret statutes that precluded any trial testimony of mental condition, including that which would cast doubt on the defendant's state of mind at the time he committed the charged offense. The Montana statutes in question expressly allow evidence of mental disease or defect to be introduced to rebut proof of defendant's state of mind. Section 46-14-102, MCA.

The United States Supreme Court refused in 1952 to accept the argument that the Due Process Clause required the use of a particular insanity test or allocation of burden of proof. Leland v. Oregon (1952), 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302. The Oregon statute upheld in Leland required the defendant to prove insanity beyond a reasonable doubt. This allocation of proof was found constitutionally sound because the State retained the burden to prove the requisite state of mind and other essential criminal elements. The State's due process burden of proof was further emphasized in In Re Winship (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368. Winship established that the prosecution must prove beyond a reasonable doubt every element constituting the crime charged.

The Montana statutory scheme is consistent with the dictates of Leland and Winship. The 1979 amendments to the criminal code do not unconstitutionally shift the State's

burden of proof of the necessary elements of the offense. The State retains its traditional burden of proving all elements beyond a reasonable doubt.

## 2. The Delusional Defendant

In addition to asserting that the insanity defense is a fundamental constitutional right, the appellant contends that insanity is a broader concept than mens rea. Korell argues that individuals may be clearly insane yet also be capable of forming the requisite intent to commit a crime. For example, an accused may form intent to harm under a completely delusional perception of reality or act without volitional control. It is defendant's position that the due process of these defendants is compromised by state law which permits conviction of delusional defendants and those who act without volitional control.

Addressing the delusional defendant first, we note that planning, deliberation and a studied intent are often found in cases where the defendant lacks the capacity to understand the wrongfulness of his acts. Fink & Larene, In Defense of the Insanity Defense, 62 Mich. B. J. 199 (1983). Illustrations include the assassin acting under instructions of God, the mother drowning her demonically-possessed child, and the man charging up Montana Avenue on a shooting spree believing he is Teddy Roosevelt on San Juan Hill. Defendant contends that these people could properly be found guilty by a jury under current Montana law.

As some commentators have noted, the 1979 amendments to the law on mental disease or defect may actually have lowered the hurdle mentally disturbed defendants must clear to be

exculpated. In order to be acquitted, the defendant need only cast a reasonable doubt in the minds of the jurors that he had the requisite mental state. See, Bender, *After Abolition: The Present State of the Insanity Defense in Montana*, 45 Mont. L. R. 133, 141 (1984). As a practical matter, the prosecutor who seeks a conviction of a delusional and psychotic defendant will be faced with a heavy burden of proof.

Assuming the delusional defendant is found guilty by a jury, factors of mitigation must be considered by the sentencing judge in accordance with section 46-14-311, MCA. The fact that the proven criminal state of mind was formed by a deranged mind would certainly be considered. In addition, a defendant can be sentenced to imprisonment only after the sentencing judge specifically finds that the defendant was not suffering, at the time he committed the offense, from a mental disease that rendered him unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. Section 46-14-312(1), MCA.

### 3. The Volitionally-Impaired Defendant

The test of mental disease or defect that was afforded defendants prior to 1979 read as follows:

> "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he is unable either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." Section 46-14-101, MCA (1978).

It is the second prong of this standard, the volitional aspect of mental disease or defect, that appellant claims has been eliminated. He argues that there are those who lack the ability to conform their conduct to the law and that

16

elimination of the involuntariness defense is unconstitutional.

The volitional aspect of mental disease or defect has not been eliminated from our criminal law. Consideration of a defendant's ability to conform his conduct to the law has been moved from the jury to the sentencing judge. The United States Supreme Court found in Leland, 343 U.S. at 801, that the "irresistible impulse" test of insanity was not implicit in the concept of ordered liberty. Additionally, the minimum requirements of any criminal offense are still a voluntary act and companion mental state. Section 45-2-202, MCA, provides that "[a] material element of every offense is a voluntary act. . . ."

This Court has not judicially recognized the automatism defense. Applications of the defense may exist where a defendant acts during convulsions, sleep, unconsciousness, hypnosis or seizures. See, People v. Grant (1978), 71 Ill.2d 551, 377 N.E.2d 4. Our criminal code's provisions requiring a voluntary act and defining involuntary conduct adequately provide for such defenses. See sections 45-2-202 and 45-2-101(31), MCA.

To the extent that the 1979 criminal code revisions allegedly eliminated the defense of insanity-induced volitional impairment, we find no abrogation of a constitutional right.


C.  Eighth Amendment Considerations

Appellant next contends that abolition of the affirmative defense of insanity violates the Eighth Amendment's prohibition of cruel and unusual punishment. In Robinson v.

17

California (1962), 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758, the Supreme Court held that punishment for the status crime of drug addiction violated the Eighth Amendment prohibition. The Court declared that any law which created a criminal offense of being mentally ill would also constitute cruel and unusual punishment. The Court noted that had the California statute under which Robinson was convicted required proof of the actual use of narcotics, it would have been valid. In Powell v. Texas, 392 U.S. at 532, a statute imposing a fine for public intoxication was found to not violate the Eighth Amendment. There the Court reasoned that although alcoholism might be a disease, the statute was valid because it punished an act, not the status of being an alcoholic.

The Montana Criminal Code does not permit punishment of a mentally ill person who has not committed a criminal act. As such, the statutes avoid the constitutional infirmities discussed in Robinson v. California, supra, and Powell v. Texas, supra.

Prior to sentencing, the court is required to consider the convicted defendant's mental condition at the time the offense was committed. This review is mandatory whenever a claim of mental disease or defect is raised. The plain language of the statute reads: ". . . the sentencing court shall consider any relevant evidence. . . ." Section 46-14-311, MCA (emphasis added). Whenever the sentencing court finds the defendant suffered from a mental disease or defect, as described in section 46-14-311, MCA, the defendant must be placed in an ". . . appropriate institution for custody, care and treatment. . . ." Section 46-14-312(2), MCA.

These requirements place a heavy burden on the courts and the department of institutions. They serve to prevent imposition of cruel and unusual punishment upon the insane. Since the jury is properly preoccupied with proof of state of mind, it is imperative that the sentencing court discharge its responsibility to independently review the defendant's mental condition.

It is further argued that subjecting the insane to the stigma of a criminal conviction violates fundamental principles of justice. We cannot agree. The legislature has made a conscious decision to hold individuals who act with a proven criminal state of mind accountable for their acts, regardless of motivation or mental condition. Arguably, this policy does not further criminal justice goals of deterrence and prevention in cases where an accused suffers from a mental disease that renders him incapable of appreciating the criminality of his conduct. However, the policy does further goals of protection of society and education. One State Supreme Court Justice who wrestled with this dilemma observed: "In a very real sense, the confinement of the insane is the punishment of the innocent; the release of the insane is the punishment of society." State v. Stacy (Tenn. 1980), 601 S.W.2d 696, 704 (Henry, J., dissenting).

Our legislature has acted to assure that the attendant stigma of a criminal conviction is mitigated by the sentencing judge's personal consideration of the defendant's mental condition and provision for commitment to an appropriate institution for treatment, as an alternative to a sentence of imprisonment.

For the foregoing reasons we hold that Montana's abolition of the insanity defense neither deprives a defendant of

his Fourteenth Amendment right to due process nor violates the Eighth Amendment proscription against cruel and unusual punishment. There is no independent constitutional right to plead insanity.

## II. REBUTTAL TESTIMONY

The evening before the final day of trial, the Ravalli County Attorney's office received word that Cedric Hames could testify he purchased ammunition for Korell a couple days before the shooting. Hames was told to report to the courthouse the next morning where a subpoena would await him.

Hames was the owner of a bar that the defendant frequented in the weeks preceding the shooting. The prosecution briefly interviewed Hames in the morning and decided to put him on the stand. Since Korell had twice requested Hames to buy ammunition for him in the days before the shooting, Hames' testimony would tend to rebut defendant's claim that he did not act purposely or knowingly.

Hames was put on the stand without any prior notice to the defendant or the court. Our discovery statutes specifically provide that the defendant and the court must be given such notice:

> "For the purpose of notice only and to prevent surprise, the prosecution shall furnish to the defendant and file with the clerk of the court no later than 5 days before trial or at such later time as the court may for good cause permit a list of witnesses the prosecution intends to call as rebuttal witnesses to the defenses of justifiable use of force, entrapment, compulsion, alibi, or the defense that the defendant did not have a particular state of mind that is an essential element of the offense charged." Section 46-15-301(3), MCA.

Hames' testimony was short and to the point. Defense counsel did not object to the direct examination of the witness. However, after counsel learned on cross-examination that the witness had contacted the prosecution the day before, defense moved for a mistrial.

Outside the presence of the jury, the court heard arguments of counsel and interviewed the witness. Convinced that there was no designed surprise by the prosecution, the court denied the motion for a mistrial. Defense counsel was offered a continuance to prepare cross-examination. Defense refused this offer and chose not to examine the witness further.

Failure of the county attorney to give the court and defendant notice of the new rebuttal witness constituted clear error.

This issue concerning the failure of the prosecution to give notice of a rebuttal witness arose in State v. Madera (Mont. 1983), 670 P.2d 552, 40 St.Rep. 1558. In Madera a witness not previously announced was used by the prosecution on the last day of trial to rebut an alibi witness. This Court announced that when unanticipated exigencies arise at trial the court may waive the time limitations for giving notice when good cause is shown. Additionally, this Court said that if surprise is claimed by the other party, the proper procedure is to ask for a continuance so that preparation may be made.

While Madera established that the time limitations of section 46-15-301(3), MCA, may be waived, it did not suggest that notice may also be waived. There was no reason the deputy county attorney could not have notified the court and defendant that Hames had come forward the morning he

21

testified. Had such notice been given, the court could have ruled whether there was good cause to waive the time limitations.

The recognized error in this case does not rise to the level of reversible error. Defense counsel was given an opportunity to prepare for cross-examination. The continuance offer was refused. Counsel claims prejudicial surprise on appeal yet did not avail himself of the opportunity to alleviate such prejudice at trial.

While the prejudicial surprise of this particular testimony is found harmless error, future prosecutorial disregard of these discovery notice provisions will not be condoned.

### III. VOLUNTARY INSTRUCTION

The trial court refused an instruction offered by the defendant that: "A material element of every crime is a voluntary act." The court did include four instructions that specifically mentioned the requirement of voluntariness:

> "[Instruction No. 17] A person commits the offense of attempt when with purpose to commit a specific offense he voluntarily does any act toward the commission of such offense."

> "[Instruction No. 24] . . . the State must prove that each element of the offense was done purposely or knowingly and voluntarily. . . ."

> "[Instruction No. 38] . . . You may consider such evidence because the defendant asserts that due to mental disease or defect he could not have had a particular state of mind which is an element of the offense, i.e., that he did not purposely or knowingly and voluntarily commit the acts constituting the offense. . . ."

> "[Instruction No. 40] . . . a person, to be guilty of any of the offenses charged,

22

> must have committed the act or acts
> voluntarily, while having, with regard to
> each element contained in the law defin-
> ing the offenses, one of the mental
> states contained in said definition
> . . ."

The refused instruction is based on section 45-2-202, MCA, which states: "A material element of every offense is a voluntary act. . . ." This code provision expresses the common law principle previously discussed that every crime must consist of an act and a criminal intent.

One of defendant's theories in this case was that he did not act voluntarily due to his mental condition. Although this Court permitted section 45-2-202, MCA, to be used for such a theory in Zampich, supra, the statute was not intended to address psychological impairment. The voluntary act requirement properly reflects physiological considerations; those who act by reflex, while sleepwalking, etc., should not be held criminally responsible. See, section 45-2-101(31), MCA; Bender, supra, at 144-145; W. LaFave & A. Scott, Criminal Law § 25, at 179-181 (1972).

Defendant's theory of his case was not prejudiced by the trial court's refusal to give the instruction. Arguably, the instruction would not have hurt the prosecution as it correctly states the law of Montana. However, we sense that defense counsel was offering the instruction for a context to which it was not designed. The four instructions set forth above properly instructed the jury on the requirement of a voluntary act.

IV. SENTENCING

Four doctors testified before the jury concerning Korell's mental condition. The State produced Dr. Herman

Walters, Ph.D., a clinical psychologist, and Dr. Verne Cressey, M.D., a psychiatrist. The defendant called Dr. William Stratford, M.D., a forensic psychiatrist, and Dr. Michael Marks, Ph.D., a clinical psychologist. Additionally, a psychiatrist, Dr. Noel Howell, M.D., was retained by the defense and filed an evaluation with the court although he did not testify.

These expert witnesses were allowed to express their opinions concerning Korell's medical diagnosis, whether he suffered from mental disease or defect at the time of the shooting, his capacity to form the requisite intent and his ability to control his behavior. Additionally, Dr. Stratford was called to testify at the sentencing hearing on his recommendations for treatment of Korell. All the doctors filed written evaluations with the court.

Immediately after announcing sentence, the trial judge stated:

> "I'm going to address myself in regard to your mental condition. Let me say that the jury heard the evidence by all of the various doctors in regard to your mental condition. The jury reached their conclusion after some twenty-four to twenty-six hours, and in that conclusion they found that you were responsible and that you did have the mental state required by the statute. For me to indulge otherwise would amount to nothing but nullification of the jury's effort, and I will not do so."

This pronouncement flies in the face of the court's basic duty to independently evaluate the defendant's mental condition. The trial judge's refusal to act compels this Court to vacate the defendant's sentence and remand for resentencing.

As Part I of this opinion established, whenever mental disease or defect is put in issue, the trial judge must

review the defendant's mental condition prior to sentencing. Deferring to a jury verdict indicates a misunderstanding of the distinct roles of the jury and court.

The jury has a narrow duty under the statutes: to consider mental disease or defect insofar as it relates to criminal state of mind. The fact that a jury has found the existence of a requisite mental state does not conclusively establish the defendant's sanity or fitness for penal punishment. That determination must be independently made by the sentencing judge and the record must reflect the deliberative process.

If problems of cruel and unusual punishment of the insane are to be avoided, the sentencing judge must faithfully discharge the review duties of sections 46-14-311 and 46-14-312, MCA. The sentence is vacated.

## V. ATTORNEY FEES

As a final matter, defense counsel appeals the order affixing his attorney fees. The court determined that reasonable fees for Korell's defense were $12,000 and awarded the appointed attorney this amount. Counsel contends that the amount is unfair in light of the defense presented.

This Court has adopted guidelines to be followed when awarding a court-appointed attorney compensation. Those guidelines are set forth in State v. Boyken (1981), 196 Mont. 122, 637 P.2d 1193, and the District Court order at issue. That order reflects that the District Court properly considered the Boyken factors of time expended, nature of the defense, fees paid for similar services elsewhere, public funds available, the responsibility of the legal profession,

25

and needs of the accused. Having so reached its decision, we will not disturb the trial court's award of fees.

We remand this cause to the District Court for resentencing consistent with this opinion.

_____
Chief Justice

We concur:

_____

_____

_____
Justices

Mr. Justice Frank B. Morrison, Jr., concurs in part and dissents in part.

I concur with the result reached by majority on all issues except the admission of certain testimony. This dissent specifically relates to the admission of rebuttal testimony received from one Cedric Hames. The majority opinion finds that the failure to notice this witness and the subsequent admission of the witness's testimony, constituted error but was harmless. The basis of the majority's determination that reception of the evidence constituted harmless error was that defense counsel was given an opportunity, through being afforded a continuance, for cross-examination of the witness. Such opportunity did not cure the error.

The thrust of Hames' testimony was to counter defendant's evidence with respect to "state of mind." This was the pivotal issue in the case.

The unquestionable prejudice to defendant in not knowing of Hames' testimony, was that defendant was denied opportunity to counter the testimony with psychiatric testimony offered on behalf of defendant. To effectively answer the State's position that the defendant planned this act defendant must be allowed the opportunity to explain the meaning of the actions portrayed by Hames. Defendant's psychiatrist was denied this opportunity because the reality of the proof was unknown. Defendant was further denied the right to deal with this damaging evidence either in voir dire or at any other stage of the trial. I cannot conceive of a majority of this Court holding that cross-examination of an unnoticed witness satisfies the legal requirement that defendant be entitled to know the State's case and be given the opportunity to prepare a defense.

Sometimes I feel we may as well abolish the defendant's procedural safeguards for we routinely hold that the State's failure to comply constitutes harmless error. At least we would all be saved the expense of lengthy appeals.

Justice

Justice John C. Sheehy, dissenting:

It is a matter of coincidence that I dictate this dissent on Sunday, November 11, 1984. This used to be called Armistice Day, and the television news is full of reports of a reunion of Viet Nam war veterans in Washington, D.C. Coincident with their reunion is the dedication of a memorial statuary to Viet Nam war veterans, the seven-foot tall representation of three Viet Nam war servicemen who seem to be peering intently at an earlier Viet Nam war memorial on which is inscribed the names of more than 58,000 servicemen who lost their lives in that war.

It was a war in which nothing was won and much was lost. A part of that loss, not recognized or admitted by the authorities at first, was the damaging effect to the cognitive abilities of some that served in the war. Only recently has there been positive acceptance that there does exist in some ex-servicemen a post-Viet Nam war traumatic syndrome.

Jerry Korell, the evidence is clear, is a victim of that syndrome. Before his term of service, he was a mentally functional citizen. After his return from service, he is mentally dysfunctional. We can measure our maturity about how we meet such problems by the fact that Jerry Korell now will inevitably spend a great part of his life in jail for his actions arising out of that dysfunction.

Jerry Korell's dysfunction can be traced almost directly to the Viet Nam war. There are thousands of others whose mental aberrations have no such distinct origins. From genes, from force of environment, from physical trauma, or from countless other causes, their actions do not meet the

29

norm. You know them well--the strange, the different, the weird ones.

Sometimes (not really often it should be said) these mentally aberrent persons commit a criminal act. If the criminal act is the product of mental aberration, and not of a straight-thinking cognitive direction, it would seem plausible that society should offer treatment, but if not treatment, at least not punishment. The State of Montana is not such a society.

I would hold that Montana's treatment of the insanity defense is unconstitutional for at least two reasons: One, it deprives the insane defendant of due process by depriving him of a trial by jury for each element of the crime for which he is charged; and two, it invades the insane defendant's right against self-incrimination.

In this dissent I use the terms "insanity" and "insane" in their universal sense. They include the broad spectrum of mental aberration from the maniacal to those deprived of their reasoning processes by such vague forces as prolonged melancholia, depression, paranoia and the like. I use the terms in the sense of those persons who meet the American Law Institute formulation of insanity for criminal purposes:

> "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." Model Penal Code, section 4.01(1), proposed official draft (1962).

Before 1979, it was clear in Montana that persons suffering from a mental disease or defect were not responsible for their criminal conduct. Former section 95-501, R.C.M. 1947, provided:

30

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he is unable either to appreciate the criminality of his conduct or to conform his conduct with the requirements of law."

"(2) As used in this chapter, the term 'mental disease of defect' does not include an abnormality manifested only by repeated criminal or other antisocial conduct."

The provisions of former section 95-501, R.C.M. 1947, reflected the American Law Institute position with respect to the insanity defense. The language found in subsection (2) of section 95-501, R.C.M. 1947, was a caveat formed by the ALI to restrict the definition of mental disease or defect.

In 1979, the legislature acted to repeal and eliminate what was subdivision (1) of section 95-501, R.C.M. 1947. What remains are only the provisions of present section 46-14-101, MCA, which defines mental disease or defect in the same manner as subdivision (2) of former section 95-501, supra.

Thus, the 1979 legislature removed any statutory direction that a person is not responsible for criminal conduct if at the time of the conduct, as a result of mental disease or defect, he was unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

The 1979 legislature went further. While one may not use the defense of mental disease or defect unless within ten days of entering plea one files a written notice of a purpose to rely on such mental disease or defect to prove that one did not have a particular state of mind which is the essential element of the offense charged (section 46-14-201, MCA), once one has filed such a notice, the court thereupon appoints a psychiatrist or requests the superintendent of the

31

Montana State Hospital to designate a qualified psychiatrist to examine and report upon the mental condition of the defendant. Section 46-14-202, MCA.

Under section 46-14-202(3), in the examination of the defendant any method may be employed which is accepted by the medical profession for the examination of those alleged to be suffering from mental disease or defect. Under section 46-14-212, the psychiatrist is to be permitted to have reasonable access to the defendant for the purpose of the examination. Chemical injection, if accepted by the medical profession, is one of the methods that may be used in such an examination. There can be no question that, regardless of the method of the examination, the insane defendant's right against self-incrimination is at once imperiled.

I would not, however, on the grounds of self-incrimination alone, hold the process unconstitutional. I recognize the necessity, in cases where insanity is pleaded as a defense, that the State have equal right to psychiatric testimony to the same extent that is enjoyed by the defendant. What is more serious constitutionally, however, is what our statutes provide with respect to the testimony at trial from the examining psychiatrist.

Section 46-14-213, MCA, provides that when the psychiatrist who has examined the defendant testifies, his testimony may include his opinion "as to the ability of the defendant to have a particular state of mind which is an element of the offense charged." The statute takes away from the psychiatrist, and from the jury, the previous test of whether the defendant lacked the capacity to appreciate the criminality of his conduct or his ability to conform his conduct to the requirements of the law. The statute instead places in the

32

power of the psychiatrist, and takes from the jury, the determination of whether the defendant had the particular state of mind which is an element of the offense charged. Thus is the defendant deprived of his right of trial by jury as to every element of the crime charged against him. See, In Re Winship (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368.

The elements of the crime of deliberate homicide in Montana are a voluntary act (section 45-2-202, MCA), coupled with either purpose or knowledge (section 45-5-102, MCA). Thus the jury must be instructed, even where the insanity is an issue, that if the defendant acted purposely, or with knowledge, he is guilty of the offense. The jury is then instructed that a person acts knowingly if, with respect to the conduct, he is aware of his conduct. Section 45-2-101(33), MCA.

The jury is also instructed that the defendant acts purposely if it is his conscious object to engage in that conduct or to cause that result. Section 45-2-101(58), MCA. No consideration is given by the jury as to whether the defendant lacks substantial capacity to appreciate the criminality of his conduct, or whether he is unable to conform his conduct to the requirements of the law. If the psychiatrist has testified that the defendant had the state of mind required as an element of the crime, that is, in the case of deliberate homicide, purpose or knowledge, the defendant is criminally guilty. The jury never gets to determine if the defendant acted by force of mental aberration.

In a case under present Montana law, therefore, when the defendant relies on insanity to explain the crime of deliberate homicide, the jury is led to the inevitable

conclusion by <u>managed</u> <u>testimony</u> that he is indeed guilty of the crime.

Montana's statutory scheme seeks to ameliorate the managed conviction of the insane defendant by providing that at his <u>sentencing</u>, he having been convicted of a criminal act, the sentencing judge may take into consideration his insanity! At the sentencing, the judge, and not the jury, shall for the first time consider whether the defendant was suffering from a mental disease or defect which rendered him unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. Section 46-14-311, -312, MCA.

For the reasons foregoing, I would hold the statutory scheme pertaining to insane defendants in Montana unconstitutional. I do not hold with the majority that there is no independent constitutional right to plead insanity. I consider that position the ultimate insanity. I would hold that he has an independent constitutional right to trial by jury of the fact of his ability to commit a crime by mental aberration.

For like reasons, I do not agree with the majority with respect to the rebuttal testimony offered by Cedric Hames. I would hold that reversible error occurred in that instance. Principally I would so hold because the State learned that Korell had twice requested Hames to buy ammunition for him in the days before the shooting from his examination by the psychiatrists. The State used his psychiatric examination to help convict him.

I also emphatically disagree with the majority with respect to the necessity of the voluntary instruction.

Section 45-2-202, MCA, states that "a material element of every offense is a voluntary act . . ." The majority opinion seems to limit this statutory provision by determining that the statute reflects only physiological considerations, stating that those who act by reflex, or while sleepwalking, should not be held criminally responsible. That is too narrow an interpretation of "voluntary." The word has its root in the Latin word for will, and any interpretation of it should include acts done through one's will, choice or consent. A jury should be specifically instructed that a criminal act requires one's will, choice or consent.

Unfortunately, our criminal code does not define a "voluntary act." It does define an "involuntary act" to include reflexes or convulsions, unconscious sleep movements, hypnosis and such. Section 45-2-101(31), MCA. The majority has changed the definition of an involuntary act to limit the scope of a voluntary act which, to me, is not the intent of the criminal code and is improperly restrictive.

I would reverse and remand for a new trial, and direct the District Court to instruct the jury on the ALI formulations respecting insanity as applied to criminal acts.

I suggest a retrial on the basis of the ALI formulations not because I consider those formulations the last word on the subject, but because we do have remaining in our statutes some recognition of the ALI formulations with respect to the insanity defense. Under present law the District Court must look to the ALI formulations to determine the extent of the sentence to be imposed, section 46-14-311, MCA. The real problem facing this Court is that the abolition by the legislature in 1979 of mental disease or

35

defect as an exculpatory defense leaves a cavity in our criminal law that is the obligation of the legislature to fill. Unless we now recognize the ALI formulations on the basis that there is legislative recognition of their validity in the sentencing process, we have no legislative direction in the statutes for the insanity defense.

It is curious that Montana abolished the insanity defense in 1979, before the onset of the Hinckley trial. Hinckley's attack on President Reagan, and the subsequent acquittal of Hinckley in June 1982, prompted a rash of enactments and proposals for enactments with respect to the insanity defense. The Standing Committee on Association Standards for Criminal Justice of the American Bar Association at the time of the Hinckley verdict had been considering mental health law and criminal justice issues for close to a year and a half. The Hinckley verdict triggered the Committee's consideration of key issues in order to advise Congress, state legislatures and the public in the aftermath of the concern arising from the Hinckley verdict. At least part of the credit must be given to that Standing Committee for the fact that Congress has refused so far to abolish the insanity defense.

The Standing Committee on Association Standards has since promulgated its proposed criminal justice mental health standards for consideration by the Bar and by legislatures. It proposes that the insanity defense be considered as "the defense of mental nonresponsibility," and further proposes that such a condition be exculpatory to a criminal charge. The Committee examined enactments such as Montana's and in comment had this to say:

"This approach, which would permit evidence of mental condition on the requisite mental element of the crime but eliminate mental nonresponsibility as an independent, exculpatory doctrine, has been proposed in several bills in Congress, and adopted in Montana, Idaho and Utah. The ABA has rejected it out of hand. Such a jarring reversal of hundreds of years of moral and legal history would constitute an unfortunate and unwarranted overreaction to the Hinckley verdict.

". . .

"Yet the issue of criminal blameworthiness should require a deeper inquiry. Implicit in this concept is a certain quality of knowledge and intent, going beyond a minimal awareness and purposefulness. Otherwise, for example, a defendant who knowingly and intentionally kills his son under the psychotic delusion that he is the biblical Abraham and his son, the biblical Isaac, could be held criminally responsible. The Montana, Idaho and Utah enactments, on their face, would deny a defense to such a defendant." American Bar Association, Standing Committee on Association Standards for Criminal Justice, Report to the House of Delegates, August, 1984, Standard 7-6.1, Commentary P. 327.

Thus has Montana's abolition of the insanity defense in 1979 been held up for criticism and disrespect by national authorities and scholars. It behooves our legislature, which will be meeting in a few months, to reexamine its mental health laws as they pertain to criminal justice and to revamp the same. It could do nothing finer than to adopt the standard of exculpatory definition proposed by the Standing Committee on Association Standards of the American Bar Association which follows:

"Standard 7-6.1. The defense of mental nonresponsiblity [insanity].

"(a) A person is not responsible for criminal conduct if, at the time of such conduct, and as a result of mental disease or defect, that person was unable to

37

appreciate the wrongfulness of such conduct.

"(b) When used as a legal term in this standard 'mental disease or defect' refers to:

"(i) impairments of mind, whether enduring or transitory; or, (ii) mental retardation either of which substantially affected the mental or emotional processes of the defendant at the time of the alleged offense."

There are accompanying standards proposed by the Standing Committee which the legislature should also adopt, which would soften the aspects of self-incrimination which I have described above, and especially a proposed standard which would prevent the experts from invading the province of the jury. Particularly applicable, in my opinion, would be Standard 7-6.6:

"Standard 7-6.6. Limitation on opinion testimony concerning mental condition.

"Expert opinion testimony as to how the development, adaptation and functioning of the defendant's mental processes may have influenced defendant's conduct at the time of the offense charged should be admissible. Opinion testimony, whether expert or lay, as to whether or not the defendant was criminally responsible at the time of the offense charged should not be admissible."

It is clear that the Standing Committee, by proposing Standard 7-6.6, recognized the impropriety of handing to medical or other persons the ultimate question to be determined by the jury, whether the defendant is entitled to be exculpated because of his mental processes at the time of the crime charged. The Report of the Standing Committee points out that the issue is jurisprudential, and not medical, and for that reason we should provide an exception to section 704 of the Montana Rules of Evidence, which allows opinion testimony on the ultimate question in the ordinary case.

In the meantime, I would reverse the conviction of Jerry Korell, and return this cause for a trial on his insanity defense.

_John C. Sheehy_
Justice

Justice Daniel J. Shea, dissenting:

I join in the dissent of Justice Sheehy and I also will be filing my own dissent setting forth in more detail my own reasons.

_Daniel J. Shea_
Justice